# Exhibit 2

**Federal Trade Commission**
December 2025



# Biennial Report to Congress

## Under the Do Not Call Registry Fee Extension Act of 2007

**Do-Not-Call Registry Fee Extension Act of 2007**

**Federal Trade Commission**
**Biennial Report to Congress**
**Reporting on Fiscal Years 2024-2025**

## I.    Report Overview

In February of 2008, Congress passed the Do-Not-Call Registry Fee Extension Act of 2007 ("Fee Extension Act"),[1] requiring this biennial report on the National Do Not Call Registry ("Registry").  In compliance with the Fee Extension Act, this Report contains a summary of the current operations of the Registry, the impact on the Registry of new telecommunication technologies, and the impact of the established business relationship exception on our enforcement efforts.

The Registry currently has over 258 million active registrations.  During FY 2025, the Registry increased by nearly 4.8 million phone numbers.  Nearly 10,000 sellers, telemarketers, and exempt organizations subscribed to access the Registry in FY 2025, and over 1,800 of those entities paid fees totaling nearly $18 million.

## II.    Introduction

The Registry has been in operation since the summer of 2003.[2]  Consumers continue to register their telephone numbers, verify registration of numbers, and submit complaints of suspected violations at a high rate.  During the last 22 years, the Registry has also successfully served businesses, as they accessed the Registry, and law enforcement, as they investigated violations of the Do Not Call rules.  The FTC continues to look for and make improvements to the system to better serve consumers, telemarketers, and law enforcers while maintaining the efficient management and accuracy of the Registry.  FTC staff also works closely with the contractor overseeing the Registry to ensure that the integrity of the Registry is maintained.

The Fee Extension Act required the FTC, in consultation with the Federal Communications Commission ("FCC"), to first report to Congress on the Registry by December 31, 2009, and biennially thereafter.  Specifically, the Fee Extension Act requires that the FTC's report provide the following information:

- the number of consumers who have placed their telephone number(s) on the Registry;

- the number of persons paying fees for access to the Registry and the amount of such fees;

- the impact on the Registry of

- o  the five-year re-registration requirement;
- o  new telecommunication technology;
- o  number portability and abandoned telephone numbers; and

- the impact of the established business relationship exception on businesses and consumers.

This biennial Report provides an overview of the operation of the Registry for FY 2024 and 2025.

## III.    Number of Consumers Who Placed Their Telephone Numbers on the National Registry

Americans continue to utilize the Registry in very high numbers.  In the first four days following the launch of the Registry on June 27, 2003, more than 10 million numbers were registered.  As of September 30, 2003, a total of 51,968,777 telephone numbers had been registered.  With each fiscal year, the number has steadily increased.  By the end of FY 2024, the number of active registrations was 253,721,138.  As of September 30, 2025, the Registry had 258,515,050 active registrations.[3]

## IV.    Number of Entities Paying Fees for Access to the National Registry

In FY 2024, a total of 1,768 entities paid fees totaling $15,903,963 for access to the Registry.  In FY 2025, a total of 1,834 entities paid fees totaling $17,703,274 for access to the Registry.[4]  In addition, certain entities can access data from the Registry without having to pay a fee.  These include entities that access five or fewer area codes of data in a year, as well as exempt organizations (such as charitable organizations) that are not required to access the Registry to comply with do-not-call requirements under federal law, but voluntarily access the Registry to avoid calling consumers who do not wish to receive calls.[5]  In FY 2024, 7,045 entities subscribed to access five or fewer area codes at no charge, and 605 entities claiming "exempt organization" status obtained free access.  In FY 2025, 7,182 entities subscribed to access five or fewer area codes at no charge, and 709 entities claiming "exempt organization" status obtained free access.

–2–

**V.      Impact on the National Registry of the Five-Year Re-Registration Requirement, New Telecommunications Technology, and Number Portability and Abandoned Telephone Numbers**

**A.  Five-Year Re-Registration Requirement**

When the Registry was first implemented in 2003, registrations were scheduled to expire after five years.  Out of concern that the expiration of numbers on the Registry would be detrimental to consumers, the FTC, in the fall of 2007, pledged not to drop any numbers from the Registry, pending final Congressional action.[6]  The following February, Congress passed the Do-Not-Call Improvement Act of 2007 ("DNCIA"), eliminating the automatic removal of numbers from the Registry.[7]

At the time the DNCIA was passed in February 2008, no registrations had yet expired, because the first registrations were made in late June 2003, less than five years earlier.  Consequently, no consumers ever had to re-register their numbers.  The FTC continues to believe that eliminating the re-registration requirement has not decreased the accuracy of the Registry, but that it has enabled consumers to maintain their right to privacy without interruption and made it possible to avoid the cost associated with educating consumers about the need to re-register.

**B.  New Telecommunications Technology**

The FTC also continues to track how technology affects the Registry and the consumers and telemarketers who access it.  Advancements in technology have numerous benefits for consumers but have also made it easier for bad actors to place illegal calls.  For example, Voice over Internet Protocol (VoIP) technology allows callers, including lawbreakers, to make more calls inexpensively from anywhere in the world.  Technological developments also allow illegal telemarketers to easily fake, or "spoof," the caller ID information that accompanies their calls, which allows them to conceal their identity from consumers and law enforcement.  Further, many telemarketers use automated dialing technology to make calls that deliver prerecorded messages (commonly referred to as "robocalls"), which allow violators to make many illegal calls without significant expense.  One effect of these otherwise beneficial technological developments is that bad actors who refuse to comply with the Registry or other telemarketing laws are able to make more illegal telemarketing calls at a lower cost using methods that make it difficult for the FTC and other law enforcement agencies to find and deter them.

As a result of these technological developments, consumer complaints about illegal calls—especially robocalls—initially increased significantly.  In the fourth quarter of 2009, the FTC received approximately 63,000 complaints about illegal robocalls each month.  In fiscal year 2017, that number increased nearly six-fold, with the FTC receiving more than 375,000 complaints about illegal robocalls each month.  From FY 2017 through FY 2024, consumer complaints steadily decreased.  In FY 2024, the FTC received an average of about 92,000

–3–

complaints about robocalls per month.  In FY 2025, however, the FTC received a monthly average of about 133,000 robocall complaints.

Despite the uptick in robocall complaints in FY 2025, consumer complaints remain substantially down from their peak in FY 2017.  The decrease in complaints is attributable in part to the FTC's law enforcement strategies.  The FTC has pursued VoIP providers that facilitate illegal calls through law enforcement actions and warning letters as part of its Project Point of No Entry.[8]  In March 2024, however, a federal district judge granted one of the VoIP providers' motion to dismiss, finding that the provider was immune from liability under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. The FTC has also sued dialing platforms and soundboard technology providers that helped provide the software used to blast illegal robocalls.[9]  On July 18, 2023, the FTC announced Operation Stop Scam Calls, a coordinated sweep involving more than 180 actions brought by more than 100 federal and state law enforcement partners.[10]  Since 2003, the Commission has filed 173 lawsuits against 570 companies and 449 individuals alleged to be responsible for placing billions of unwanted telemarketing calls to consumers.  The FTC has collected nearly $400 million from these violators.

To help end caller ID spoofing, among other purposes, Congress passed the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act") at the end of 2019.[11]  To combat illegal caller ID spoofing, and as directed by the TRACED Act, the FCC required that voice service providers implement the STIR/SHAKEN caller ID authentication framework in their Internet Protocol (IP) networks and take reasonable measures to implement a caller ID authentication solution for non-IP networks by June 30, 2021.[12]  Consistent with the TRACED Act, the FCC extended the deadline for STIR/SHAKEN implementation for small and other eligible voice service providers until June 30, 2023; however the agency shortened the small voice service provider extension for those providers the FCC determined are most likely to be the source of illegal robocalls.[13]  Non-IP legacy networks do not support STIR/SHAKEN but, pursuant to the TRACED Act and FCC regulation, providers with non-IP networks must participate in efforts to develop a non-IP caller ID authentication framework.

To combat the technologies that telemarketers use to make illegal calls, FTC staff has undertaken a number of initiatives, described below, designed to spur the development and availability of technology that will protect consumers from illegal calls.  FTC staff have worked closely with industry groups, academic experts, and counterparts at federal, state, and international government bodies to encourage the development of new technologies and telecommunications standards to combat illegal calls.

The FTC has held five public challenges designed to spur private sector development of technological solutions that will stop illegal telemarketing calls.  The FTC held its first public challenge in conjunction with its 2012 Robocall Summit, offering a $50,000 prize to the individual or small team who proposed the best technological solution that blocks robocalls on consumers' landlines and mobile phones.  After reviewing 798 submissions, the FTC announced

—4—

three winning solutions on April 2, 2013.[14]  One of the winners, "NomoRobo," was on the market and available to consumers by October 2013—just 6 months after being named one of the winners.  NomoRobo, which reports blocking nearly 4.1 billion calls, is being offered directly to consumers by a number of telecommunications providers, and is available as an app on iPhones and Android phones.[15]  Following on the success of the first challenge, the FTC conducted its second contest, "Zapping Rachel," in August 2014, where it awarded $17,000 in prizes to five winners who developed solutions that improved telephone honeypots—a system of phone lines that collect information and data about illegal calling patterns.[16]  In 2015, the FTC conducted two more challenges:  "DetectaRobo" and "Robocalls: Humanity Strikes Back."  The FTC held "DetectaRobo" in conjunction with the 2015 National Day of Civic Hacking in June 2015, and asked contestants to create predictive algorithms that can identify robocalls.[17]  "Robocalls: Humanity Strikes Back" followed, in August 2015, and challenged contestants to build solutions that not only block robocalls from reaching consumers, but enable consumers to forward those unwanted robocalls to a crowd-sourced honeypot so that law enforcement and industry stakeholders can use the data collected.[18]  Winners for the 2015 challenge were announced on August 17, 2015.[19]  Finally, in November 2023, the FTC announced a Voice Cloning Challenge to encourage technological innovation in AI voice cloning detection.  In April 2024, the FTC named four winners, each of which proposed methods of determining whether a voice on the other end of a call is synthetic.

The challenges contributed to a shift in the development and availability of technological solutions in this area, particularly call-blocking and call-filtering products.  All of the major voice service providers now offer call-blocking or call-filtering products to some or all of their customers.[20]  In addition, there are a growing number of free or low-cost apps available for download on wireless devices that offer call-blocking and call-filtering solutions.[21]

The FTC has taken additional measures to support analytics companies and voice service providers with their call-blocking and call-filtering efforts.  In August 2017, the FTC began releasing a daily list of Do Not Call and robocall complaints, including the caller ID number, the date and time the unwanted call was received, the topic of the call, and whether the call was a robocall.  Several analytics firms and call-blocking companies report that this daily data release improved their ability to identify abusive and fraudulent calls.[22]

The FCC also plays a vital role in responding to new technologies in telemarketing. In 2025, the FCC took its first steps in a new approach to combatting illegal robocalls, including those made by telemarketers.  This new approach seeks to tackle illegal robocalls at every point in the call path, from the point of origination all the way to the point of delivery to the consumer.  With a significant amount of illegal robocalls originating overseas, the FCC's October 2025 *Call Branding Notice of Proposed Rulemaking* seeks comment on ways to help consumers know when an incoming call originates in a foreign country.  The proposal explores deterring the use of U.S. area codes by overseas callers and other ways to visually indicate that a call is coming from abroad.[23]  In addition, the proposal seeks to improve call blocking analytics by considering whether a call originated from outside of the United States.[24]

To more broadly address the issue of bad actors using numbering resources to originate illegal robocalls, harm public safety, and undermine national security, the FCC Chairman has proposed a plan which would require that all VoIP providers that have previously obtained and that are seeking to obtain direct access to numbering resources comply with robocall-related certification requirements, file foreign ownership information, and certify compliance with other important FCC rules designed to strengthen public safety, prevent fraud, and enhance transparency for consumers.[25]  The proposal would also refresh the record on reclaiming numbering resources obtained directly from the number administrator by interconnected VoIP providers who subsequently had their authorizations revoked or terminated.  Additionally, the proposal would seek comment on whether VoIP providers that appear on or use equipment from the FCC's "Covered List"—comprised of entities whose equipment or services pose an unacceptable risk to national security—should be barred from obtaining a direct access authorization and whether any other restrictions on VoIP numbering authorizations or numbering resources are appropriate.

To stop harmful call traffic as it travels across the U.S. network, the FCC issued a Notice of Apparent Liability for Forfeiture against a provider for transmitting government imposter calls in apparent violation of the Commission's know-your-customer rules.[26]  The FCC also issued cease-and-desist letters to a foreign provider that originated jury scam calls into the United States,[27] and a provider that transmitted cable/ISP imposter calls.[28]  Additionally, the FCC removed over 1,300 non-compliant voice service providers from its Robocall Mitigation Database, effectively disconnecting these providers from the U.S. phone network.[29]  The FCC's Robocall Mitigation Database (RMD) is a critical tool through which the agency ensures providers are actively combatting robocalls and implementing the STIR/SHAKEN caller ID authentication framework.  The providers the FCC removed from the RMD violated FCC rules by failing to maintain accurate RMD certifications, thereby shirking their obligations to protect consumers from illegal robocalls.  These actions will help ensure that other providers cease accepting traffic from providers that fail to do their duty when it comes to stopping robocalls.

The FCC also strengthened its call blocking rules to ensure that providers block illegal calls before they reach consumers.  The FCC's *February 2025 Call Blocking Order* adopted new rules that expand the use of do-not-originate lists, a proven tool for effectively blocking illegal calls.[30]  Providers use do-not-originate lists to spot suspicious phone calls that appear to come from numbers that do not originate calls – such as unused, unallocated, and invalid numbers. The new rules require all voice service providers in a call path to block calls purporting to come from numbers appearing on a reasonable do-not-originate list.

The STIR/SHAKEN caller ID authentication framework is a critical element for tracking, blocking, and warning customers about malicious robocalls.  And yet, this digital fingerprint on phone calls is washed off if any part of the call path passes through non-IP network technology. To close this loophole that has allowed robocalls to bypass Caller ID authentication in April 2025, the FCC adopted a *Non-IP Caller ID Authentication Notice of Proposed Rulemaking* that

seeks to end delays in implementing caller ID authentication solutions for non-IP calls to ensure that calls do not lose their digital fingerprints when passing through older, non-IP-based networks.[31]  The FCC also took steps to close the non-IP gap in October 2025, by seeking comment on ways to facilitate a successful transition to all-IP interconnection for voice services.[32]

Finally, the FCC is seeking ways to empower consumers to better understand who is calling them once a call is delivered.  The October 2025 *Call Branding Notice of Proposed Rulemaking* proposes to require providers to give consumers accurate caller name and other information, including call branding information, ensuring they no longer have to guess whether a call is one they want to answer.[33]  The FCC further proposes ways for originating voice service providers to verify that this transmitted information is accurate and secure so that consumers can trust it. These proposals build on the industry-developed STIR/SHAKEN caller ID authentication framework, which has made spoofing more difficult, by adding information about the caller and providing consumers with better tools to regain control of their phones.

The FTC and the FCC also share information with the public to help facilitate technological solutions, such as call blocking, including call topic categories for consumers to choose from to help the FTC and FCC identify trends.  The FTC and FCC share anonymized complaint data with the public in an easily reviewable format.  In FY 2025, the top five topics selected by consumers for unwanted call complaints filed with the FTC were:

- Reducing debt
- Imposters (calls pretending to be government, businesses, or family and friends)
- Medical & prescriptions
- Energy, solar, & utilities
- Home improvement & cleaning

### C. Number Portability and Abandoned Telephone Numbers

According to FCC regulations, people changing service providers are able to retain their phone numbers, i.e., are able to port their number to the new service provider.[34]  As the FTC developed procedures to identify numbers to remove from the Registry, the FTC considered how to identify these ported numbers and differentiate them from abandoned or disconnected numbers.  To increase the likelihood that abandoned numbers are removed without removing ported numbers, the FTC's contractor first identifies the numbers that have been designated as new connections in the compiled disconnection and reassignment data.  A number is designated as disconnected and reassigned for purposes of removing it from the Registry only if neither the name nor the address for the new account match the name or address associated with the previous account for that number.

Consequently, the only numbers removed from the Registry are those that have been disconnected (or abandoned) and then reconnected to a different account holder at a different address. This process, which is performed monthly, ensures that numbers that have been ported are not removed, but numbers that truly have been abandoned are deleted.

## VII. Impact of Established Business Relationship Exception on Consumers and Businesses

The FTC's Telemarketing Sales Rule (TSR) and the FCC's rules contain exemptions that permit a seller or telemarketer to call a person who has listed his or her telephone numbers on the Registry if the call is to a person with whom the seller has an "established business relationship."[35] An established business relationship under the TSR and the FCC rules is a relationship based on: 1) the consumer's purchase, rental, or lease of the seller's goods or services, or a financial transaction between the consumer and seller, within the 18 months immediately preceding the date of a telemarketing call; or 2) a consumer's inquiry or application regarding a product or service offered by the seller within the three months immediately preceding the date of a telemarketing call.[36] This exception allows sellers and their telemarketers to call customers who have recently made purchases or made payments, and to return calls to prospective customers who have made inquiries, even if their telephone numbers are on the Registry. Consumers have the option to request to be put on the seller's entity-specific-do-not-call list. Such a request terminates the established business relationship with that seller for purposes of making telemarketing calls even if the consumer continues to do business with the seller. On November 18, 2015, the FTC amended the TSR to make clear that sellers and telemarketers have the burden of proof to demonstrate the existence of an established business relationship.[37] Under the TSR, the relationship must be directly "between a seller and a consumer."[38]

Many businesses rely on this exemption to conduct telemarketing campaigns directed at recent or long-time customers, or consumers who have expressed an interest in becoming customers. Many consumers, however, perceive telemarketing calls that fall within this exemption to be inconsistent with the Registry because the consumers are unaware of the exception or do not realize that they have a relationship with the seller that falls within the definition of an established business relationship.

Such perceptions by consumers are especially likely when the relationship between the consumer and the seller arises from a brief, one-time transaction, or when the seller identified in the telemarketing call and the seller with whom the consumer has a relationship are part of the same legal entity, but are perceived by consumers to be different because they use different names or are marketing different products. Both the FTC and the FCC have stated that the issue of whether the exemption applies to calls by or on behalf of sellers who are affiliates and subsidiaries of an entity with which a consumer has an established business relationship depends on consumer expectations. The FTC characterizes the issue as follows: "would consumers likely

–8–

be surprised by that call and find it inconsistent with having placed their telephone number on the national 'do-not-call' registry?"[39]

For both the FTC and the FCC, the factors to be considered in this analysis include: 1) whether the subsidiary's or affiliate's goods or services are similar to the seller's; and 2) whether the subsidiary's or affiliate's name is identical or similar to the seller's name. The greater the similarity between the nature and type of goods or services sold by the seller and any subsidiary or affiliate, and the greater the similarity in identity between the seller and any subsidiary or affiliate, the more likely it is that the call will fall within the established business relationship exemption.[40]

Some businesses, seeking to circumvent the Registry, have sought to exploit the established business relationship exemption by making calls to persons who have not had the requisite contact with the seller. For example, some marketers claiming a business relationship have improperly placed telemarketing calls to consumers after acquiring the consumers' telephone numbers from others. So-called "lead generators" collect information on consumer interests through web advertising, by offering coupons or samples, or simply by "cold calling" consumers in order to determine whether the consumer has any interest in a particular product or service, such as debt relief or home alarms. Lead generators responsible for these so-called "call verified," "permission-based," or "opt-in" leads often fail to remove numbers listed on the Registry before calling consumers. Lead-generating companies that have engaged in this type of "cold calling" have agreed to pay civil penalties to settle charges that their calls violated the TSR.[41] At the same time, some telemarketers and sellers have acquired leads from lead generators and used them in telemarketing campaigns without screening the numbers to remove those listed on the Registry. In this way, a single sales pitch can produce multiple illegal calls, generating one or more calls from both the lead generators and the telemarketer.

Telephone calls from telemarketers to phone numbers provided by lead generators generally do not fall within the established business relationship exception because, while the consumers *may* have a relationship with the lead generator, they do not have an established business relationship with the seller who has purchased the leads. Unless the consumer inquired into the services of a specified seller, or the lead generator made disclosures that would alert the consumer that he or she should expect telemarketing calls from the seller as a result of his or her communications with the lead generator, the seller cannot claim that it has a relationship with the consumer such that it can ignore the consumer's request not to receive telemarketing calls. In several enforcement actions, businesses that made telephone calls to consumers on the Registry after acquiring the consumers' names from a lead generator agreed to pay civil penalties to settle charges that their calls violated the TSR.[42]

Other businesses have sought to circumvent the Registry by utilizing sweepstakes entry forms as a way to exploit the established business relationship exemption, arguing that the submission of a sweepstakes entry form creates an established business relationship for purposes of the TSR. The TSR, however, does not permit companies to circumvent the Registry in this

–9–

manner because a sweepstakes entry form does not create an established business relationship for purposes of the TSR.  Companies have agreed to pay civil penalties for making illegal calls that relied upon sweepstake entry forms as a basis for making telemarketing calls.[43]

More recently, lead generators have attempted to exploit the TSR's provisions that allow calls to numbers on the Registry if the consumer consents to receive the call.[44]  These lead generators known as "consent farms" often lure consumers to websites with offers of free prizes or job opportunities.  The consent farms trick consumers into purportedly giving permission to dozens or even hundreds of third parties to place telemarketing calls to the consumers.  The TSR does not permit these practices.  First, the TSR does not allow lead generators to obtain consent for robocalls and transfer that consent to third-party callers.  Under the TSR, the callers themselves have to obtain consent from consumers.  Second, the lead generators do not obtain meaningful consent from consumers because consumers do not understand what they are purportedly consenting to.  The FTC has brought cases against these consent farms to highlight their practices.[45]

## VIII.   Conclusion

The Registry exists to provide consumers with a choice of whether to receive most telemarketing calls.  It is important that the FTC and FCC continue to work to keep it accessible and effective for consumers and telemarketers.  As new technology provides both helpful innovations and new challenges, both agencies actively seek to address and confront these challenges.  This includes encouraging private industry, government entities, academia, and other interested parties to work towards solutions and create new strategies.

The FTC publishes an Annual Do Not Call Registry Data Book that gives a substantial amount of detail regarding registration numbers and other statistical information regarding the Registry.  The 2025 Data Book can be found at https://www.ftc.gov/system/files/ftc_gov/pdf/DNC-Data-Book-2025.pdf.  The FTC has also created the Tableau Public page, available at FTC.gov/exploredata, that provides DNC data updated on a quarterly basis.  This resource allows consumers to explore the data interactively, including drilling down to information about their state or county.[46]  FTC staff continues to work closely with the contractor overseeing the Registry to ensure that the integrity of the Registry is maintained and that consumers' preferences not to receive most telemarketing calls are honored.

–10–

**ENDNOTES**

1.      Pub. L. No. 110-188, 122 Stat. 635 (2008) *as codified at* 15 U.S.C. § 6154.

2.      On January 29, 2003, the FTC issued the final amendments to the Telemarketing Sales Rule ("TSR") that, *inter alia*, established the National Do Not Call Registry.  16 C.F.R. § 310.

3.      These totals exclude those telephone numbers that have been deleted by consumers or eliminated as part of the FTC's process for removing disconnected and reassigned numbers from the Registry.  A telephone number that was registered more than once between FY 2003 - FY 2021 is counted only once in these totals.

4.      As established by the Fee Extension Act, in FY 2021, the annual fee per area code was $66 (with the first five area codes provided at no cost) with the maximum annual fee for accessing the entire Registry being $18,044.

5.      Such "exempt" organizations include entities that engage in outbound telephone calls to consumers that do not involve the sale of goods or services, such as calls to induce charitable contributions, to raise funds for political purposes, or to conduct surveys.  They also include entities that are engaged solely in calls to persons with whom they have an established business relationship or from whom they have obtained express written agreement to call, pursuant to the Amended TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B)(1) or (2), and who do not access the Registry for any other purpose.

6.      *See* FTC Press Release, FTC Pledges Not to Drop Any Numbers From Do Not Call Registry, Pending Final Congressional or Agency Action on Whether to Make Registration Permanent (Oct. 23, 2007), available at http://www.ftc.gov/opa/2007/10/dnctestimony.shtm.

7.      Pub. L. No. 110-187, 122 Stat. 633 (2008).

8.      *See, e.g.*, *United States v. XCast Labs, Inc.*, 23-cv-03645 (C. D. Cal. filed May 12, 2023); *United States v. Hello Hello Miami, LLC*, 1:23-cv-22553 (S.D. Fla. filed July 18, 2023).  *See* FTC Press Release, FTC Ramps Up Fight to Close the Door on Illegal Robocalls Originating from Overseas Scammers (Apr. 11, 2023), available at https://www.ftc.gov/news-events/news/press-releases/2023/04/ftc-ramps-fight-close-door-illegal-robocalls-originating-overseas-scammers-imposters.

9.      *See FTC v. Christiano*, 8:18-cv-00936 (C.D. Cal. filed Mar. 26, 2019) (operator of dialing platform used to place outbound robocalls); Dialing platforms and soundboard); *United States v. Yodel Techs., LLC*, 8:23-cv-01575 (M.D. Fla. filed July 14, 2023) (operator of soundboard technology platform).

10.    *See* Press Release, FTC, Law Enforcers Nationwide Announce Enforcement Sweep to Stem the Tide of Illegal Telemarketing Calls to U.S. Consumers (July 18, 2023), available at https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-law-enforcers-nationwide-announce-enforcement-sweep-stem-tide-illegal-telemarketing-calls-us.

11.    Pub. L. No. 116-105, 133 Stat. 3274 (2019).

12.    *Call Authentication Trust Anchor Implementation of TRACED Act Section 6(A)— Knowledge of Customers By Entities With Access to Numbering Resources*, WC Docket Nos. 17-97, 20-67, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241, 3252-58, paras. 25-35 (2020).

13.    *Call Authentication Trust Anchor*, WC Docket No. 17-97, Second Report and Order, 36 FCC Rcd 1859, paras. 40-48, 52-53, 66-70 (2020).

14.    *See* Press Release, FTC Announces Robocall Challenge Winners; Proposals Would Use Call Filter Software to Reduce Illegal Calls (Apr. 2, 2013), available at http:/www.ftc.gov/opa/2013/04/robocall.shtm.

15.    *See* https://www.nomorobo.com/ (last visited Dec. 8, 2025).

16.    *See* Press Release, FTC Announces Winners of "Zapping Rachel" Robocall Contest (Aug. 28, 2014), available at https://www.ftc.gov/news-events/press-releases/2014/08/ftc-announces-winners-zapping-rachel-robocall-contest.

17.    *See* Fed. Trade Comm'n, DetectaRobo, https://www.ftc.gov/detectarobo; Press Release, FTC Announces New Robocall Contests to Combat Illegal Automated Calls (Mar. 4, 2015), available at https://www.ftc.gov/news-events/press-releases/2015/03/ftc-announces-new-robocall-contests-combat-illegal-automated.

18.    *See* Fed. Trade Comm'n, Robocalls: Humanity Strikes Back, https://www.ftc.gov/strikeback; Press Release, FTC Announces New Robocall Contests to Combat Illegal Automated Calls (Mar. 4, 2015), available at https://www.ftc.gov/news-events/press-releases/2015/03/ftc-announces-new-robocall-contests-combat-illegal-automated.

19.    Press Release, FTC Awards $25,000 Top Cash Price for Contest-Winning Mobile App That Blocks Illegal Robocalls (Aug. 17, 2015), available at https://www.ftc.gov/news-events/press-releases/2015/08/ftc-awards-25000-top-cash-prize-contest-winning-mobile-app-blocks.

20.    For example, T-Mobile first offered its wireless customers two free products, "Scam ID" and "Scam Block", that flag and block unwanted calls; it now offers an integrated product,

"ScamShield." *See* https://www.t-mobile.com/customers/scam-shield (last visited Dec. 12, 2025). Verizon offers a product called "Call Filter" to its wireless customers that also attempts to flag and block unwanted calls. *See* https://www.verizon.com/solutions-and-services/call-filter/ (last visited Dec. 12, 2025). In addition, a number of carriers make Nomorobo available to their VoIP or cable line customers. *See, e.g.*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (listing available call blocking resources from a number of wireline providers) (last visited Dec. 12, 2025).

21.    The Cellular Telecommunications Industry Association (CTIA) maintains a list of some of the available call blocking apps, both for iOS devices (https://www.ctia.org/consumer-resources/how-to-stop-robocalls/ios-robocall-blocking/) and for Android devices (https://www.ctia.org/consumer-resources/how-to-stop-robocalls/android-robocalls-blocking/) (last visited Dec. 12, 2025).

22.    *See* Pairing Government Data with Private-Sector Ingenuity to Take on Unwanted Calls, available at https://strategy.data.gov/proof-points/2019/06/21/pairing-government-data-with-private-sector-ingenuity-take-on-unwanted-calls/ (last visited Dec. 12, 2025).

23.    *See Advanced Methods to Target and Eliminate Unlawful Robocalls, Call Authentication Trust Anchor, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Dismissal of Outdated or Otherwise Moot Robocalls Petitions*, CG Docket Nos. 17-59, 02-278 and 25-307, WC Docket No. 17-97; Further Notice of Proposed Rulemaking, FCC 25-76 (2025) (*Call Branding Notice of Proposed Rulemaking)*.

24.    *See id.*

25.    *See Numbering Policies for Modern Communications, Telephone Number Requirements for IP Enabled Service Providers, Implementation of TRACED Act Section 6(a) – Knowledge of Customers by Entities with Access to Numbering Resources,* WC Docket Nos. 13-97, 07-243, 20-67, Third Report and Order and Third Further Notice of Proposed Rulemaking, Public Draft (Nov. 11, 2025), https://www.fcc.gov/document/updating-rules-curb-robocallers-access-phone-numbers. This item would adopt the proposal that the new or revised certification, acknowledgment, and disclosure obligations set forth in the *2023 Second Report and Order* should apply to interconnected VoIP authorization holders that had received their authorizations prior to that order. *See Numbering Policies for Modern Communications; Telephone Number Requirements for IP Enabled Service Providers; Implementation of TRACED Act Section 6(a) – Knowledge of Customers by Entities with Access to Numbering Resources; Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, WC Docket Nos. 13-97, 07-243, 20-67 and IB Docket No. 16-155, Second Report and Order and Second Further Notice of Proposed Rulemaking, 38 FCC Rcd 8591 (2023) (*Direct Access Second Report and Order*).

26.     *See Telnyx LLC*, Notice of Apparent Liability for Forfeiture, 40 FCC Rcd 1720, 1720, para. 1 (2025).

27.     *See* Letter from Patrick Webre, Acting Chief, FCC Enforcement Bureau to Douglas Fechter, CFO, BCM One Cloud Communications LLC dba Flowroute, 2025 WL 2144551 (May 16, 2025).

28.     *See* Letter from Patrick Webre, Acting Chief, FCC Enforcement Bureau to Brisa Cruz, Belthrough, 2025 WL 2622184 (Sept. 10, 2025).

29.     *See Robocall Mitigation Database Filers*, EB-TCD-24-00036891, Order, DA 25-694, 2025 WL 2253753 (EB Aug. 6, 2025) (removing 185 providers from the RMD); *Robocall Mitigation Database Filers*, EB-TCD-25-00038590, Order, DA 25-737, 2025 WL 2496602 (EB Aug. 25, 2025) (removing over 1,200 providers from the RMD); *BPO VOIP, End Zone Financial Services, ESMIYAH LLC, Fiber Flux VOIP, Intuitive Communications LLC, IP Networks LLC, Nova Dialer LLC, Schedule 10 Specialists, Inc., Servisden, SkyPulse Voip, The Vision Connect, VoipTech LLC*, EB-TCD-25-00039435, Order, DA 25-913 (EB Sep. 30, 2025) (removing twelve providers from the RMD).

30.     *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Eighth Report and Order, 40 FCC Rcd 1902 (CGB Feb. 28, 2025) (*February 2025 Call Blocking Order*).

31.     *See Call Authentication Trust Anchor*, WC Docket No. 17-97, Notice of Proposed Rulemaking, 40 FCC Rcd 3467 (2025) (*Non-IP Caller ID Authentication Notice of Proposed Rulemaking*).

32.     *See Advancing IP Interconnection, Accelerating Network Modernization, Call Authentication Trust Anchor*, WC Docket Nos. 25-304, 25-208, and 17-97, Notice of Proposed Rulemaking, FCC 25-73 (2025).

33.     *See Call Branding Notice of Proposed Rulemaking*.

34.     47 C.F.R. § 52.21(m) and § 52.23.

35.     16 C.F.R. § 310.4(b)(1)(iii)(B)(2) and § 310.2(q).  The FCC's rules similarly include an exemption for live-voice calls to consumers with whom the seller has an established business relationship.  *See* 47 C.F.R. § 64.1200(c)(2), (f)(5), and (f)(15)(ii).  These exemptions do not apply if the person has asked to be on the seller's "entity-specific" do-not-call list by telling the seller or its representatives that he or she does not wish to receive telemarketing calls from the seller.  *See id.* § 64.1200(f)(5)(i).  The FCC eliminated the established business relationship exemption that applied to prerecorded telemarketing calls to residential lines, effective October 16, 2013.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of*

–14–

*1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1845-47, paras. 35-43 (2012).

36.      *See United States v. Columbia House Co.*, Civ. No. 05C-4064 (N.D. Ill. filed July 14, 2005).  In this case, the company agreed to a settlement after the FTC's analysis found that its telemarketers continued to call former customers after the 18-month period provided by the established business relationship exemption had expired.

37.      16 C.F.R. § 310.4(b)(1)(iii)(B)(2).

38.      16 C.F.R. § 310.2(q).

39.      *See* Statement of Basis and Purpose for Final Amended Telemarketing Sales Rule, 68 Fed. Reg. 4580, 4594 (Jan. 29, 2003).  *See also* 47 C.F.R. § 64.1200(f)(5)(ii) (under the FCC's rules, a consumer's "established business relationship with a particular business entity does not extend to affiliated entities unless the [consumer] would reasonably expect them to be included").

40.      *See* Complying with the Telemarketing Sales Rule, at https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule.  Similarly, the FCC has stated that "affiliates fall within the established business relationship exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or services offered and the identity of the affiliate." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14082-83, para. 117 (2003).

41.      *See U.S. v. Consumer Education.info, Inc.*, 1:16-cv-02692 (D. Colo. filed Nov. 1, 2016), available at https://www.ftc.gov/enforcement/cases-proceedings/152-3081/consumer-educationinfo-inc.

42.      *See FTC v. Career Education Corp. et al.*, No. 1:19-cv-05739 (N.D. Ill. filed Aug. 27, 2019); *United States v. Versatile Mktg. Sols., Inc. et al.*, No. 1:14-cv-10612-PBS (D. Mass. filed Mar. 10, 2014); *United States v. Central Florida Invs., Inc.*, Civ. No. 6:09-cv-00104-PCF-GJK (M.D Fla. filed Jan. 15, 2009); *United States v. Ameriquest Mortg. Co.*, Civ. No. 8:07-cv-01304-CJC-MLG (C.D. Cal. filed Nov. 6, 2007).

43.      *See United States v. Electric Mobility Corp.*, No. 1:11-cv-2218-RMB-KMW (D.N.J. filed April 19, 2011); *United States v. All in One Vacation Club, L.L.C.*, No. 6:09-cv-103-Orl-31DAB (M.D. Fla. filed Jan. 14, 2009); *United States v. Craftmatic Indus., Inc.*, 2:07-cv-04652-LDD (E.D. Pa. filed Nov. 6, 2007).

44.      16 C.F.R. § 310.4(b)(1)(iii)(B)(1); (v)(A).

45.     *See United States v. Fluent, LLC*, 9:23-cv-81045 (S.D. Fla. filed July 18, 2023); *United States v. Viceroy Media Sols.*, 3:23-cv-03516 (N.D. Cal. filed July 14, 2023).

46.     https://public.tableau.com/profile/federal.trade.commission#!/vizhome/ DoNotCallComplaints/Maps.



**Federal Trade Commission**

ftc.gov